UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PAYROLL RESOURCE GROUP,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHEQUITY, INC.,<br><br>Defendant. | Case No. 23-cv-02794-TSH<br><br>**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 18 |

## I.   INTRODUCTION

Pending before the Court is Defendant HealthEquity, Inc.'s Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF No. 18. Plaintiff The Payroll Resource Group filed an Opposition (ECF No. 19), and Defendant filed a Reply (ECF No. 20). For the reasons stated below, the Court **GRANTS** the motion.[1]

## II.   BACKGROUND

In April 2002, Plaintiff The Payroll Resource Group entered into a written agreement ("Agreement") with MHM Business Services ("MHM") for a license to use payroll software. ECF No. 1-2 (Complaint) ¶ 5. Under the terms of the Agreement, Plaintiff paid a one-time set-up fee, and subsequently paid monthly fees "for licensing privileges and technical support." ECF No. 1-2 (Agreement) at 11. MHM was acquired by WageWorks in or around 2007; MHM and/or WageWorks provided services under the terms of the Agreement until 2019. Complaint ¶ 6. On or about September 2019, MHM and/or WageWorks assigned the Agreement to Defendant HealthEquity, Inc. *Id.* In June 2020, HealthEquity wrote to Plaintiff, informing Plaintiff that it

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 7, 8.

1   would no longer support the software. *Id.* ¶ 10.  On August 31, 2022, HealthEquity stopped

2   providing support services for the software. *Id.* ¶ 11.

3         On May 2, 2023, Plaintiff filed this action in California Superior Court, alleging breach of

4   contract under Missouri law and violation of California's Unfair Competition Law ("UCL"),

5   Section 17200. *See* Complaint.  Defendant removed to federal court based on diversity.  ECF No.

6   1.

7         In Defendant's Motion for Judgment on the Pleadings, Defendant seeks judgment on

8   Plaintiff's breach of contract claim, its unfair competition claim, and on certain remedies in

9   Plaintiff's Prayer for Relief.  ECF No. 18.

### III.   LEGAL STANDARD

11         "After the pleadings are closed—but early enough not to delay trial—a party may move for

12   judgment on the pleadings." Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is properly

13   granted when, accepting all factual allegations in the complaint as true, there is no issue of

14   material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez*

15   *v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (brackets and internal quotation marks

16   omitted).  Like a motion to dismiss under Rule 12(b)(6), a motion under Rule 12(c) challenges the

17   legal sufficiency of the claims asserted in the complaint. *Id.*  Indeed, a Rule 12(c) motion is

18   "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin*

19   *v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principal

20   difference" between Rule 12(b)(6) and Rule 12(c) "is the timing of filing"); *Cafasso, U.S. ex rel.*

21   *v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).

22         Judgment on the pleadings should thus be entered when a complaint does not plead

23   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

24   550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

25   content that allows the court to draw the reasonable inference that the defendant is liable for the

26   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is

27   not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant

28   has acted unlawfully." *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule

1    12(c) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the

2    pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire &*

3    *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

4          "If the Court determines that judgment on the pleadings is warranted, it must then decide

5    whether to grant leave to amend." *Jackson v. CEVA Logistics*, No. 19-Ccv-07657-LHK, 2020 WL

6    6743915, at *3 (N.D. Cal. Nov. 17, 2020) (citing *Harris v. Cty. of Orange*, 682 F.3d 1126, 1135

7    (9th Cir. 2012)). "Dismissal without leave to amend is appropriate only when the Court is

8    satisfied that an amendment could not cure the deficiency." *Harris*, 682 F.3d at 1135 (reversing

9    district court's dismissal under Rule 12(c) because plaintiffs should have been given opportunity

10   to amend). Documents attached as exhibits to the complaint are considered part of the complaint

11   for purposes of a motion for judgment on the pleadings. *Hal Roach Studios v. Richard Feiner &*

12   *Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989); *Amfac Mortg. Corp. v. Arizona Mall of Tempe,*

13   *Inc.*, 583 F.2d 426, 429–30 (9th Cir. 1978) (considering documents attached to complaint in

14   deciding motion to dismiss).

## IV.  DISCUSSION

### A.  Plaintiff's Breach of Contract Claim

17         Defendant HealthEquity argues that Plaintiff's breach of contract claim fails because the

18   Agreement does not impose a perpetual obligation on HealthEquity. Motion at 6. Plaintiff alleges

19   that the Agreement required HealthEquity to provide and maintain the Software in perpetuity.

20   Plaintiff contends that the Agreement requires HealthEquity to provide both a license and support

21   services to Plaintiff in perpetuity, and that HealthEquity breached the Agreement when it stopped

22   providing support for the Software. Complaint ¶ 11; Opp'n at 3, 6–8. Missouri substantive law

23   governs Plaintiff's breach of contract claim. *See* Agreement ¶ 9.

24         "Missouri courts will construe a contract to impose an obligation or right in perpetuity only

25   when the language of the agreement *compels* that construction." *Superior Concrete Accessories v.*

26   *Kemper*, 284 S.W.2d 482, 490 (Mo. 1955) (emphasis in original) (citing *Paisley v. Lucas*, 143

27   S.W.2d 262, 271 (Mo. 1940), *overruled on other grounds by Novak v. Baumann*, 329 S.W.2d 732

28   (Mo. 1959). The parties' intent to impose a perpetual obligation must be "unequivocally

United States District Court
Northern District of California

1    expressed." *Paisley*, 143 S.W.2d at 270–71.

2        In lieu of an unequivocal perpetual term, "[i]t is the general rule in . . . Missouri . . . that

3    contracts for an indefinite period of time may be terminated at the will of either party." *Superior*

4    *Concrete Accessories*, 284 S.W.2d at 490 (provision making exclusive sales and distribution

5    contract agreement one of indefinite duration authorized either party to terminate contract at will);

6    *Paisley*, 143 S.W.2d at 271 (employment contract for an indefinite term could be cancelled by

7    either party upon reasonable notice to the other).

8        Plaintiff contends that Paragraph 1 of the Agreement "unequivocally granted" Plaintiff a

9    perpetual license to use the Software "and to receive certain training, support services,

10   maintenance and updates to the Software." Opp'n at 3, 6. Plaintiff contends that "[u]nder

11   Paragraph 1 of the Contract, the parties agreed that MHM would maintain and update the Software

12   for a perpetual term." *Id.* at 3. The Court finds that Paragraph 1 of the Agreement, under which

13   Defendant grants a "perpetual . . . license to use . . . the System" (referring to the WinFlex125

14   payroll software, related documentation, and third-party proprietary software products used in

15   conjunction with the software), unequivocally imposes a right in perpetuity. However, the Court

16   finds the Agreement does not unambiguously impose such a right as to support services, including

17   technical support and software updates.

18       On its face, Paragraph 1 only grants a perpetual "license to *use*" the System. Agreement ¶

19   1 (emphasis added). Paragraph 1 does not explicitly mention maintenance, updates, training or

20   support services. *Id.* Plaintiff contends the perpetual term described in Paragraph 1 nonetheless

21   applies to support services because the paragraph states that Defendant grants the license "in

22   accordance with this Agreement" and "as the System may be modified, revised, and updated in

23   accordance with this Agreement." *Id.*; Opp'n at 7. But the language to which Plaintiff points is

24   far from an unequivocal expression of intent to impose a perpetual obligation as to modify, revise

25   or update the System. "In accordance with this Agreement" could just as readily be interpreted to

26   direct the reader to *other* provisions of the agreement that govern modifications, revisions, and

27   updates to the System. Indeed, Paragraph 3 of the Agreement details the support services

28   Defendant was required to provide to Plaintiff and lays out the applicable support period.

4

1   Paragraph 3 reads as follows:

> **3. Support Services.** During the warranty period specified in Section 5, and thereafter subject to Licensee's payment of monthly fees, MHM will provide to Licensee the following support services: (a) modifications to the System which MHM may from time to time distribute to its customers at no additional charge, which modifications may reflect changes in federal law relating to administration of Section 125 plans and/or enhance the performance of the System; (b) reasonable telephone access, during MHM's normal business hours, to technical staff or efforts as the developer of the Software and as the distributor or licensor of the Third Party Software in solving production problems that arise in connection with Licensee's proper and authorized use of the latest release or the latest release of the System to perform in accordance with the Documentation in all material respects. Licensee shall provide to MHM reasonably detailed documentation and explanation, together with underlying data, to substantiate any such problem or failure and to assist MHM in its efforts to diagnose and correct the problem or failure. The initial support period shall be for a term of one year beginning at the expiration of the warranty period and shall be automatically renewed for subsequent terms of twelve (12) months each unless terminated in writing by Licensee providing sixty (60) days notice at any time after the initial twelve (12) months. MHM may, subject to the restrictions set out in the Exhibit A, increase the monthly support fees by giving at least sixty days prior written notice to Licensee.

Agreement ¶ 3.

Paragraph 3 describes a one-year "initial support period" to begin after the expiration of the warranty period set forth in Paragraph 5 of the Agreement. Following the initial support period, the support period "shall be automatically renewed for subsequent terms of twelve (12) months each unless terminated in writing by Licensee providing sixty (60) days notice at any time after the initial twelve (12) months." *Id.* Unlike the license to use the System set forth in Paragraph 1 of the Agreement, the support services term described in Paragraph 3 does not expressly state that the support services renewal term is perpetual.

Plaintiff has pointed to just one case—and this Court has not found any others—in which Missouri's highest court held that an automatic renewal provision was perpetual. *See Blackmore v. Boardman*, 28 Mo. 420, 426 (Mo. 1859) ("As the law discourages perpetuities, it does not favor covenants for continued renewals; but, when they are clearly made, their binding obligation is recognized and will be enforced."). Unlike in *Blackmore*, where a covenant for perpetual renewal was valid because it was "clearly expressed," *Blackmore*, 28 Mo. at 425, Paragraph 3 contains no

5

1     express language indicating that the parties agreed to perpetual renewals of support services.

2           Plaintiff argues that because the Agreement only provides for renewal at the election of
3     Plaintiff, rather than of either party, renewal must be perpetual. Opp'n at 6, 8. The limited case
4     law on this point indicates otherwise. Missouri courts have held that a "clause providing for
5     automatic renewal contradicts an intention that the contract would last forever," *Armstrong Bus.*
6     *Servs., Inc. v. H & R Block,* 96 S.W.3d 867, 877 (Mo. Ct. App. 2002), because "[a] contract that
7     runs forever has no need for renewal." *Preferred Physicians Mut. Mgmt. Grp., Inc. v. Preferred*
8     *Physicians Mut. Risk Retention Grp., Inc.*, 961 S.W.2d 100, 104 (Mo. Ct. App. 1998). Applying
9     Missouri law, the Eighth Circuit has thus held that an automatically renewable contract that is
10    terminable at will by only one party is not perpetual. *See H & R Block Tax Servs. LLC v.*
11    *Franklin*, 691 F.3d 941, 944-45 (8th Cir. 2012) (holding that duration provision indicating that
12    contract would renew "automatically" for successive five-year terms unless one party terminated
13    the agreement before automatic renewal did not impose an obligation in perpetuity). Although the
14    practical effect of an automatic renewal provision may be a contract of perpetual duration, the
15    relevant question is whether the language of the contract "unequivocally expresses the parties'
16    intent that the agreements be perpetually *enforceable*." *Id.* at 944 (emphasis in original). Plaintiff
17    argues that *Franklin* does not apply because, in contrast to Plaintiff's contract with HealthEquity,
18    the contract at issue in *Franklin* did not include "clear language . . . providing for a perpetual
19    term." Plaintiff ignores that the support services provision doesn't include any such language,
20    however. Plaintiff offers no case law to support its conclusion that the perpetual licensing term in
21    Paragraph 1 means the parties "clearly and unequivocally agreed to a perpetual term" as to
22    technical support and software updates. Opp'n at 6.

23          Plaintiff further contends the parties intended for the support services to remain in place in
24    perpetuity because Plaintiff paid one monthly fee that covered both licensing and software
25    services. Opp'n at 8; Agreement ¶ 3 ("During the warranty period specified in Section 5, and
26    thereafter subject to Licensee's payment of monthly fees, MHM will provide to Licensee the
27    following support services . . ."). A closer look at the Paragraph 3, however, indicates that
28    provided Plaintiff remained up-to-date on its monthly fees, Defendant would provide support

6

services for an indefinite period, rather than perpetually.

Plaintiff contends that HealthEquity's interpretation of the Agreement would constitute an unauthorized amendment to the contract because the Agreement describes the totality of grounds for which Defendant could terminate the contract, including if Plaintiff a) failed to pay the license fee within thirty days' notice that it was in default, b) materially violated any of the terms of Paragraphs 1 or 7, or c) materially violated any other term of the Agreement and failed to correct the violation within thirty days' notice; or if a third party initiated or was likely to initiate an infringement claim claiming rights to the software. Opp'n at 10–11; Agreement ¶¶ 5, 8. None of these conditions came to pass. However, Missouri courts have held that contracts for an indefinite period of time are terminable at will by either party with reasonable notice, even if the contract sets out specific grounds for termination. *See, e.g.*, *Haith v. Model Cities Health Corp. of Kansas City*, 704 S.W.2d 684, 686 (Mo. Ct. App. 1986) (holding that written employment contract for an indefinite period was terminable at will by either party where grounds for termination were enumerated in contract).

Finally, Plaintiff argues that a finding that the license and support services provisions are governed by different terms would lead to an absurd result by "leav[ing] Plaintiff with a license for software that is unusable and of no value to Plaintiff." Opp'n at 7. But the implications of a support services term for software that runs forever, regardless of whether the licensor plans to phase out the software, are far more absurd. If HealthEquity were required to provide support services in perpetuity, it would never be able to discontinue the software, no matter how outdated. Defendant would have to invest resources in perpetuity to maintain compatibility with new computer systems. Plaintiff argues that HealthEquity's alleged breach of contract forces Plaintiff to incur "extensive staff retraining costs." *Id.* at 5. Plaintiff ignores that its interpretation means Defendant would have to keep training technical staff on a software system from 2002 forever, for the sole purpose of providing Plaintiff with access to technical support for consultation, no matter how long it has been since it stopped licensing the software itself. *See* Agreement ¶ 3.

Accordingly, the Court finds that while the license to *use* the software is perpetual, the Agreement does not impose on HealthEquity a perpetual obligation to provide support services.

7

Plaintiff alleges that HealthEquity informed Plaintiff in June 2020 that it would no longer support the software (Complaint ¶ 10), and that HealthEquity stopped providing support for the software more than two years later, in August 2022 (Complaint ¶ 11).  Thus, the Court finds Defendant provided adequate notice that it would stop providing support services to Plaintiff.

For these reasons, Plaintiff has not plausibly alleged a claim for breach of contract. Because Plaintiff's breach of contract claim is foreclosed by Missouri law, leave to amend would be futile.  Accordingly, the Court grants Defendant's motion for judgment on the pleadings as to Plaintiff's breach of contract claim without leave to amend.

**B.     Plaintiff's Unfair Competition Claim**

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code § 17203.

The UCL's "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011).  "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof. Code § 17200.  The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotations and citation omitted).

Plaintiff brings its cause of action under all three prongs – based on unlawful, unfair, and fraudulent or deceptive and misleading action.  Complaint ¶ 21.  Plaintiff alleges "that Defendants have committed unfair, unlawful, or deceptive practices including (1) intentionally terminating Plaintiff's license to use the Software without cause; (2) asserting that the Software was no longer being maintained for purposes of Plaintiff's use but maintaining the same or similar software for HE's own use; and (3) denying Plaintiff its contractual right to use of the Software for anti-competitive purposes."  *Id*.

**1.     "Unlawful" Prong**

"The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law,

be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Ct.*, 27 Cal. App. 4th 832, 838–39 (1994). A common law violation alone, such as breach of contract, does "not amount to a violation of the 'unlawful' prong of § 17200." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010). Defendant argues that Plaintiff's UCL claim fails under the 'unlawful' prong because Plaintiff fails to "allege that Health Equity violated any law." Motion at 10. The Court finds this argument has merit. Although Plaintiff alleges that HealthEquity's actions "constitute . . . unlawful . . . business practices," Complaint ¶ 24, Plaintiff's complaint does not allege any violation of the law, and Plaintiff's opposition does not indicate otherwise. *See* Opp'n at 11–12. Accordingly, Plaintiff has not stated a claim for unlawful business practices under the UCL.

### 2. "Fraudulent" Prong

Plaintiff contends it has stated a claim under the "fraudulent" prong of the UCL based on Defendant's alleged misrepresentations "to the Plaintiff that it was no longer supporting the software and later suggesting that Plaintiff send its clients to Defendant in order to have the services provided directly by Defendant to Plaintiff's clients." Opp'n at 11; *see* Complaint ¶¶ 10, 21.

To state a claim under the "fraudulent" prong of the UCL, a plaintiff must "show that members of the public are likely to be deceived." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1267 (1992) (internal citations omitted); *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) ("fraudulent acts [under the UCL] are ones where members of the public are likely to be deceived."). Under this standard, Plaintiff's claim is fatally defective.

First, Plaintiff does not allege that members of the public have been deceived or are likely to be deceived by the misrepresentations Plaintiff alleges. Plaintiff does not even allege that members of the public are aware of HealthEquity's alleged misrepresentations. *See, e.g.*, *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1078 (C.D. Cal. 2003) ("Here, Plaintiffs have not made a showing that the public was impacted at all by DIRECTV's alleged actions. Thus, Plaintiffs' claims under the 'fraudulent' prong of the UCL fail as a matter of law.").

9

Moreover, Plaintiff is not a member of the public, and cannot pursue a claim under the fraud prong of the UCL based solely on alleged representations Defendant made to the company. *See Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 866 (N.D. Cal. 2014) (holding that "Cisco is not itself a member of the 'public,' and thus it is ineligible to bring a claim under the fraudulent prong [of the UCL] for any alleged misrepresentations Capella made to it," and collecting cases); *Watson Laboratories, Inc. v. Rhone–Poulenc Rorer, Inc.,* 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001) (holding a business competitor "is not entitled to the protection of [the fraudulent] prong of § 17200 because it is not a member of the public or a consumer entitled to such protection. The Court has identified no case under the 'fraudulent' prong of § 17200 allowing one competitor to proceed against another on the basis that the defendant deceived him"); *Travelers Prop. Casualty Co. of America v. Centex Homes,* No. 12-cv-0371-SC, 2013 WL 4528956, at *5 (N.D. Cal. Aug. 26, 2013) (holding that company could not bring a UCL fraud-prong claim absent a showing "that the alleged wrongdoing has some impact on the general public"); *Medical Instrument Development Laboratories v. Alcon Laboratories,* No. 05-cv-1138-MJJ, 2005 WL 1926673, at *5 (N.D. Cal. Aug. 10, 2005) (same).

Accordingly, Plaintiff has not stated a claim for fraudulent business practices under the UCL.

### 3. "Unfair" Prong

Plaintiff contends it has stated a claim under the "unfair" prong of the UCL based on Defendant's alleged "anticompetitive conduct." Opp'n at 11–12; *see* Complaint ¶¶ 10, 21.

"Under the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020).

The first alleged practice Plaintiff claims falls under the "unfair" prong, that Defendants

1    intentionally terminated Plaintiff's license to use the Software without cause (Complaint ¶ 21), is
2    largely duplicative of Plaintiff's breach of contract claim.  Plaintiff's complaint does not otherwise
3    allege that Defendant specifically terminated Plaintiff's license to use the Software.  Rather,
4    Plaintiff alleges that HealthEquity wrote to Plaintiff that it would no longer support the Software
5    (Complaint ¶ 10), that Plaintiff ceased providing support for the Software (Complaint ¶ 11), and
6    that Defendant's failure "to maintain and update" the Software rendered it unusable (*id.*).  In all
7    other respects, this allegation is duplicative of Plaintiff's breach of contract claim, on which the
8    Court finds Plaintiff cannot prevail.  The Court finds these facts do not constitute a practice that is
9    immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  Nor does
10   the Court find that the impact of Defendant's termination of support for the Software outweighs
11   Defendant's reasons or justifications for doing so.  Accordingly, Plaintiff does not plausibly allege
12   a claim under the unfair prong of the UCL based on the allegation that Defendant terminated
13   Plaintiff's license to use the Software without cause.
14   The remainder of Plaintiff's claim under the unfair prong of the UCL finds its footing in
15   the idea that HealthEquity stopped providing software updates and support to Plaintiff for the
16   purpose of stealing Plaintiff's customers, even though it continues to maintain the same or similar
17   software.  Opp'n at 11–12; Complaint ¶ 21.  Plaintiff's complaint does not allege that Defendant
18   violated any antitrust law or other law, nor does Plaintiff make any attempt to explain how
19   HealthEquity's actions violate the policy or spirit of any antitrust law, or any other law.  Although
20   Plaintiff alleges that HealthEquity has committed "unfair . . . business practices including . . .
21   denying Plaintiff its contractual right to use of the Software for anti-competitive purposes,"
22   Complaint ¶ 21, Plaintiff fails to allege any action by HealthEquity beyond a simple breach of
23   contract and fails to allege any harm to competition.  Plaintiff's claim fails to allege that Plaintiff
24   has lost even a single customer based on HealthEquity's alleged conduct.  *See Gregory v.*
25   *Albertson's, Inc.*, 104 Cal. App. 4th 845, 856 (2002) (consumer plaintiff who alleged that grocery
26   store maintained leasehold in state of permanent closure to keep competitors from moving in
27   failed to state a claim under unfair prong of the UCL.).  The Court likewise finds these facts do not
28   constitute a practice that is immoral, unethical, oppressive, unscrupulous or substantially injurious

United States District Court
Northern District of California

11

to consumers. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 867 (9th Cir. 2018) (holding chocolate manufacturer's alleged failure to disclose that suppliers used slave and child labor was "not substantially injurious, immoral, or unethical" and affirming dismissal for failure to state a claim under unfair prong of the UCL). Finally, as discussed above, the Court does not find that the impact of Defendant's termination of support for the Software after twenty years outweighs Defendant's justifications for doing so. Plaintiff has not pointed to any case law, nor has this Court found any, to indicate that allegations that Defendant terminated the software to steal Plaintiff's customers supports an unfair practice claim under the UCL. Hence Plaintiff has failed to state a claim under the unfair prong of the UCL.

### 4. Conclusion

For the reasons discussed above, the Court grants Defendant's motion for judgment on the pleadings as to Plaintiff's UCL claim. The Court also grants Plaintiff leave to amend its UCL claim, as it is not yet clear that no claim can be stated.

## C. Availability of Remedies

On its breach of contract claim, along with compensatory damages and costs of suit, Plaintiff asks for "other economic damages according to proof," "general damages according to proof," and for "prejudgment interest at the legal rate according to proof at time of trial[.]" Complaint at 6, Prayer for Relief as to First Cause of Action ¶¶ 1-2, 4. On its Section 17200 claim, Plaintiff asks, inter alia, "[t]hat the Defendants be ordered to pay Plaintiff restitution, including restitutionary disgorgement due to Defendants' unlawful and/or unfair activities pursuant to . . . section 17200 *et seq*[.]" Complaint at 6, Prayer for Relief as to Second Cause of Action ¶ 2. Defendant contends these remedies should be dismissed from Plaintiff's complaint because they are unavailable under the Agreement. Plaintiff contends the limitation of liability clause in the Agreement only survives termination for cause and not breach of contract.

As discussed above, the Court finds as a matter of law that Plaintiff cannot prevail on its breach of contract claim. The Court also finds Plaintiff has failed to state a claim under the UCL. Accordingly, Defendant's motion for judgment on the pleadings is moot as to the remedies Plaintiff seeks in its causes of action for breach of contract and violation of the UCL.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion. The Court **GRANTS** Plaintiff leave to amend its UCL claim. Plaintiff may amend its UCL claim within thirty days from the date of this order.

**IT IS SO ORDERED.**

Dated: April 23, 2024

THOMAS S. HIXSON
United States Magistrate Judge